## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: Synovis Life Technologies, Inc.
Securities Litigation

**MEMORANDUM OPINION
AND ORDER**
Civil No. 04-3008 ADM/AJB

_____

Reed R. Kathrein, Esq., Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins L.L.P., San Francisco, CA, and Garrett D. Blanchfield, Jr., Esq., Reinhardt, Wendorf & Blanchfield, St. Paul, MN, argued for and on behalf of Plaintiffs.

Peter W. Carter, Esq., and Theresa M. Bevilacqua, Esq., Dorsey & Whitney, LLP, Minneapolis, MN, argued for and on behalf of Defendants.

_____

## I. INTRODUCTION

On June 2, 2005, oral argument before the undersigned United States District Judge was heard on Defendants Synovis Life Technologies, Inc., Karen Gilles Larson and Connie L. Magnuson's (collectively, "Defendants" or "Synovis") Motion to Dismiss [Docket No. 29]. In their Amended Consolidated Class Action Complaint ("Complaint") [Docket No. 27], Plaintiff Alexis G. Mabry on behalf of herself and all others similarly situated ("Plaintiffs"), alleges a securities fraud class action.[1] Because Plaintiffs fail to meet the particularity requirements required for pleading a 10(b) or 10b-5 claim under the Securities Exchange Act, Defendants' Motion is granted.

## II. BACKGROUND[2]

Synovis, a Minnesota corporation with its principal place of business in St. Paul,

_____

[1] Plaintiff Mabry is joined by Movants William Quinones, Elvin Eberle, Mark Hess, individually and on behalf of Hess Investments & Home Investments, Harry J. Belli Trust, and Clarence J. Richwalski.

[2] For purposes of the instant Motion, the facts are viewed in the light most favorable to the nonmoving party. See Digi-Tel Holdings, Inc. v. Proteq Telecommunications, 89 F.3d 519, 522 (8th Cir. 1996); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

Minnesota, develops and manufactures medical devices for surgical and interventional medical treatments.  Compl. ¶ 7.  Synovis' surgical business develops, manufactures and markets implantable biomaterial products, devices for microsurgery, and surgical tools that reduce risks associated with critical surgeries.  Id. ¶ 19.  Its primary surgical product is "Peri-Strips."  The interventional business develops and manufactures medical devices used in cardiac rhythm management, neurostimulation, and vascular procedures.  Id. ¶ 20.

Throughout the class period, Larson served as Synovis' Chief Executive Officer ("CEO"), President and member of the Board of Directors.  Id. ¶ 8.  Magnuson was Synovis' Vice President of Finance and Chief Financial Officer ("CFO").  Id. ¶ 9.

## A.     Fiscal Year 2003

The class period in the instant case runs from May 21, 2003 through May 18, 2004.[3]  Id. ¶ 1.  On May 21, 2003, Synovis announced financial results for the second fiscal quarter 2003 (which ended on April 30, 2003).  May 21, 2003 Form 8-K (attaching May 21, 2003 Press Release) (Carter Decl. [Docket No. 31] Ex. 13).  Synovis reported revenues of $15.3 million, a rise of 61% from the same period of the previous year, and an increase in operating income to $1.9 million.  Id.  The press release reaffirmed its fiscal 2003 guidance and noted Synovis' high growth rate and demand for Synovis products.  Id.  On July 8, 2003 Synovis issued a press

---

[3]  In a footnote to their Memorandum of Law [Docket No. 30], Defendants protest that, after the Court appointed lead Plaintiffs and lead Plaintiffs' counsel, Plaintiffs moved the start of the class period back five months from October 16, 2003 to May 21, 2003.  Defendants argue this extension undermines the PSLRA's notice requirements and calls into question Plaintiffs' adequacy to serve as lead Plaintiffs.  See 15 U.S.C. § 78u-4(a)(3)(A)(i).  Defendants offer no authority for striking the extension and the weight of the case law suggests such action is unnecessary.  See Cheney v. Cyberguard Corp., 213 F.R.D. 484 (S.D. Fla. 2003); In re Sunbeam Sec. Litig., 1998 U.S. Dist. LEXIS 21490, *6 n.2 (S.D. Fla. Dec. 4, 1998); Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866, *14 (N.D. Ill. Aug. 6, 1997).

release revising upward the guidance for fiscal year 2003.  The company projected revenues of $58 million to $59 million, and earnings per share ("EPS") of $0.43 to $0.46 for fiscal year 2003. July 8, 2003 Press Release (Carter Decl. Ex. 14) at 1.  On August 20, 2003, Synovis reported record breaking revenues for the third quarter of fiscal year 2003, which ended July 31, 2003. Aug. 26, 2003 Form 8-K (attaching Aug. 20, 2003 Press Release) (Carter Decl. Ex. 15) at 2.  The press release reaffirmed the revised guidance for yearly revenues and earnings per share.  Id.

On September 19, 2003, when the stock price was approaching $30 per share, Synovis sold 1.5 million common shares in a private placement, yielding gross proceeds of $39 million. Compl. ¶¶ 28-29.  The stated purpose of the stock sale was to obtain funds for "working capital, general corporate purposes and potential acquisitions."  Id.

Synovis announced its fourth quarter fiscal year 2003 and year results in a December 3, 2003 press release.  Dec. 3, 2003 Form 8-K (Carter Decl. Ex. 16) at 1.  The press release reported yearly revenues of $58 million and EPS of $0.47.  Id.  Each result met or exceeded the increased guidance for fiscal year 2003.

**B.     Fiscal Year 2004**

On October 16, 2003, Synovis issued its annual guidance for fiscal year 2004.  Oct. 17, 2003 Form 8-K (attaching Oct. 16, 2003 Press Release) (Carter Decl. Ex. 17) at 1.  The press release forecast a revenue range of $75 million to $79 million and an EPS range of $0.56 to $0.60.  Id.

On January 13, 2004, prior to the end of first quarter fiscal year 2004, Synovis issued a press release acknowledging slower than anticipated sales on the interventional business side but reaffirming its annual guidance.  Jan. 13, 2004 Form 8-K (Carter Decl. Ex. 12) at 1.  In the press

release, Larson stated:

> We understand the disappointment this announcement may cause our shareholders,
> however, we encourage them to look at the annual time horizon as a measure of our
> success, as we do . . . Many of us at the company, along with our directors, are significant
> shareholders.  We believe this slow start to the year in the interventional business is a
> short term situation, and . . . we are not discouraged by it.  We know our prospects and
> remain very enthusiastic about them.

Id. at 1-2.  A similar press release, issued on February 18, 2004, reported financial results for

first quarter fiscal year 2004.  Feb. 18, 2004 Form 8-K (attaching Feb. 18, 2004 Press Release)

(Carter Decl. Ex. 18) at 2.  In the press release, Larson again declared, "[w]e expect to re-

establish strong momentum going into the second half of fiscal year 2004."  Id.

When financial results did not improve after second quarter fiscal year 2004, Synovis

issued a press release lowering its estimate of yearly revenues from between $75 million and $79

million to a range of $60 million to $64 million and EPS from between $0.56 and $0.60 to a

range of $0.28 and $0.34.  May 19, 2004 Form 8-K (attaching the May 19, 2004 Press Release)

(Carter Decl. Ex. 19) at 1.

In a May 19, 2004 earnings conference call, Larson stated a major reason why the

interventional business' growth rate was slowed was a "sharp reduction in draws against existing

purchase orders and a slowdown in new purchase orders leading to a decrease, not an increase, in

interventional business revenue."  May 19, 2004 Earnings Call (Carter Decl. Ex. 20) at 6.

Larson also stated "[w]e don't know how much our customers have in inventory, we don't know

how much [Synovis' customers are] going to sell in the future."  Id. at 20.  When asked "[s]o you

really don't have an indication clearly as to any approximate level of inventories . . . that

[customers] have in the interventional business?," Larson replied "[w]e do not and we don't

know how their sales and marketing group is performing . . . ."  Id.

During the earnings call, Larson admitted "there are never any expected orders" for products on the surgical side of the business. Id. at 21. When Larson was subsequently asked "[w]ouldn't it pay to stay in close contact with Synovis' customers and kind of find out what they're doing?," she responded, "[w]e talk to them everyday. They don't share this kind of information." Id. at 25.

Following the May 19, 2004 announcement, Synovis' stock price declined 36 percent from $14.65 per share on May 18, 2004 to $9.25 per share on May 19, 2004. Compl. ¶ 56. On December 20, 2004, the Consolidated Complaint for Violation of the Federal Securities Laws was filed.

Plaintiffs argue Defendants violated securities laws by artificially inflating Synovis' stock price. Plaintiffs allege the stock price was inflated through a process called channel stuffing, which is defined by the Securities Exchange Commission ("SEC") as "the pulling forward of revenue from future fiscal periods by inducing customers - through price discounts, extended payment terms or other concessions - to submit purchase orders in advance of when they would otherwise do so." In the Matter of Sunbeam Corp., Exchange Act Release No. 44305 (May 15, 2001) at 15. Plaintiffs assert the inflated stock price allowed Defendants to: (1) obtain significantly more cash in the September 19, 2003 stock sale for growth and acquisition purposes; (2) purchase options at a lower price; (3) receive large performance bonuses; and (4) maintain their positions.

## III. DISCUSSION

**A.      Standard of Review**

A misrepresentation claim brought under § 10(b) of the Securities Exchange Act of 1934

and Securities and Exchange Commission Rule 10b-5 must plead the following elements: (1)

misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in

violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3)

scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity

occurring in connection with the purchase and sale of a security.  In re: K-Tel Int'l, Inc Sec. Lit.,

300 F.3d 881, 888 (8th Cir. 2002).  The Private Securities Litigation Reform Act of 1995

("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation . . . is made on

information and belief, the complaint shall state with particularity all facts on which the belief is

formed."  15 U.S.C. § 78u-4(b)(1).  In short, the PSLRA "embodies the pleading requirement of

Fed. R. Civ. P. 9(b)."  K-Tel, 300 F.3d at 889.  Particularity requires an identification of the

"who, what, when, where, and how."  Id. at 890 (citation omitted).

In the instant action, Plaintiffs' allegations fail to meet the heightened pleading

requirements of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.

**B.      Loss Causation**

Near the end of the briefing period for this Summary Judgment Motion, the Supreme

Court issued its opinion in Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627 (Apr. 19,

2005).  In Dura, the Supreme Court held a complaint that merely alleges the purchase price of a

security was inflated because of a misrepresentation does not sufficiently plead the elements of

6

economic loss and loss causation under Rule 8 of the Federal Rules of Civil Procedure.  Id. at

1634.  Instead, plaintiffs claiming securities fraud must prove that the defendant's fraud caused

an economic loss.[4]  Id. at 1629.  Based on Dura's holding, Defendants argue the instant action

should be dismissed because the Complaint does not allege a causal connection between the

purported fraud and the inflated stock price.

After Dura was issued, Plaintiffs sought leave to file an amended complaint to clarify the

causation allegations.  See Pls.' Sur-Reply [Docket No. 40].  Under Rule 15 of the Federal Rules

of Civil Procedure, leave to amend should be freely given when justice so requires.  Fed. R. Civ.

P. 15.  Given the timing of the Dura decision during briefing, the Court grants Plaintiffs leave to

amend their Complaint and will examine the adequacy of the Amended Complaint ([Docket No.

40] Ex. A).

In the Amended Complaint, portions of paragraphs 69 and 71 have been amended and

paragraph 72 has been added to allege Defendants' misrepresentations inflated Synovis' stock

price and caused the economic loss.[5]  See also Am. Compl. ¶ 70.  For instance, Paragraph 70

states:

> At all relevant times, the material misrepresenatations and omissions particularized in
> this complaint directly or proximately caused or were a substantial contributing cause of
> the damages sustained by plaintiffs and other members of the class.  As described herein,
> during the Class Period, defendants made or caused to be made a series of materially
> false or misleading statements about Synovis' business, prospects and operations.  These

---

[4]  Specifically, the Dura Court found plaintiffs' complaint merely alleged plaintiffs "paid
artificially inflated prices for [Dura's] securities" and suffered "damage[s]."  Dura, 125 S. Ct. at
1634.

[5]  The Amended Complaint was filed with Plaintiffs' Sur-Reply [Docket No. 40] and only
alters the aforementioned paragraphs.  Because the parties briefed the motion citing to the
Complaint, the Court will cite to the Complaint unless otherwise noted.

material misstatements and omissions had the affect of creating in the market an unrealistically positive assessment of Synovis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

Am. Compl. at ¶ 70.  Given the Supreme Court's recognition that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," Plaintiffs' Amended Complaint sufficiently alleges a causal connection between the purported fraud and the inflated stock price. Dura at 1634 (citation omitted).

## C.      Misrepresentations and Omissions

In the section "False and Misleading Statements," paragraphs 40-54 of the Complaint, Plaintiffs reference a number of statements alleged to be false and misleading.  The paragraphs quote in full each of Synovis' press releases issued during the class period but bold and italicize the statements Defendants assert are false and misleading.  See Pls.' Opp'n to Defs.' Mot. to Dismiss the Consolidated Compl. for Violation of the Fed. Securities Laws ("Pls.' Opp'n Brief") [Docket No. 37] at 12 ("Each of the . . . key false statements is in ***bold and italics*** so that the reader of the Complaint can easily identify the false statements at issue" (emphasis in original)). Plaintiffs' Opposition Brief further refines those statements Plaintiffs allege are false and misleading.  See Id. at 4-8.   As a result, only statements that are both highlighted in the Complaint in bold and italicized script and identified in Plaintiffs' Opposition Brief are considered in this analysis.[6]

---

[6]  In some cases, Plaintiffs bolded and italicized a phrase within a larger sentence.  Where necessary for purposes of context, the remainder of the sentence is provided in brackets. Statements discussed in Plaintiffs' Opposition Brief but not bolded and italicized in the Complaint are omitted pursuant to Plaintiffs' assertion that all false or misleading statements have been highlighted in the Complaint.  See Pls.' Opp'n Brief at 12.

"We continue to drive a very high growth rate across an expanding business," [said Larson].  "The surgical and interventional businesses are both strong contributors to the company's vitality, each successfully capitalizing on their full pipelines of opportunities. Our solid balance sheet and increasing profitability continue to provide us with the operating and investment capital necessary to internally fund a high growth rate."

. . . . Synovis Life Technologies reaffirms its fiscal 2003 guidance with consolidated revenue expected to reach $50 million to $55 million and fully diluted earnings per share anticipated in the range of 38 cents to 41 cents.

May 21, 2003 Press Release; see Compl. ¶ 40.

[Synovis] has increased its revenue and earnings guidance for the fiscal year ending October 31, 2003. [At current business levels,] the company expects revenue of $58 million to $59 million with earnings of $0.43 to $0.46 per diluted share in fiscal 2003. Previous company guidance for fiscal 2003 was $50 million to $55 million in revenue, and earnings of $0.38 to $0.41 per diluted share . . . .

"Strong gains in both our surgical and interventional businesses over fiscal 2002 provide a solid basis for raising fiscal year 2003 guidance," said [Larson].  "The same factors that drove our growth in the first half of the year, increasing Peri-Strip sales and broad-based interventional business growth, are continuing into the third quarter."

July 8, 2003 Press Release; see Compl. ¶ 42.

[Larson said,] "Synovis has recorded 23 uninterrupted quarters of revenue growth, averaging 35 percent annually.  We continue to drive a very high growth rate across our surgical and interventional businesses that manufacture a range of medical devices."

July 15, 2003 Press Release; see Compl. ¶ 44.

Synovis recently increased its guidance for the fiscal year ending October 31, 2003.  At current business levels, the company expects revenue of $58 million to $59 million with earnings of $0.43 to $0.46 per diluted share.

July 15, 2003 Press Release; August 18, 2003 Press Release; see August 20, 2003 Press Release; see also Compl. ¶¶ 44-46.

[Larson said,] "The exceptional performances delivered by both the surgical and interventional businesses have made [24 consecutive quarters of year-over-year revenue growth at a 36 percent average growth rate] possible.  The strength of these businesses and the strategies each has in place underlie our enthusiasm as we look ahead."

Sales of Peri-Strips, a patent-protected biomaterial device, totaled $3.2 million, a 50

percent increase over the prior-year period.

The interventional business again demonstrated exceptional momentum in the third quarter.  Interventional revenue rose to $8.7 million, a 62 percent increase over $5.3 million in the prior-year quarter.  This segment generated $790,000 in quarterly operating income, an 86 percent gain over the prior-year quarter . . . .

[Larson concluded,] "In tandem, the surgical and interventional businesses are producing outstanding solid top- and bottom-line growth.  Individually, both businesses are performing well and are positioned for continued success.  The interventional business is showing strong revenue growth with a 73 percent growth rate for the nine months, while the surgical business is leading operating income growth at 140 percent for nine months.

Aug. 20, 2003 Press Release; see Compl. ¶ 46.

The investments we have made in research and development, manufacturing capacity and infrastructure are delivering substantial gains in our interventional and surgical businesses, while positioning both businesses for future growth.

Oct. 16, 2003 Press Release (attached to Oct. 17, 2003 Form 8-K (Carter Decl. Ex. 17)); see Compl. ¶ 48.

Synovis will, as always, adjust its guidance when and if it seems appropriate to do so.

"Our interventional business revenue jumped 59 percent over fiscal 2002" said Larson. "We continue to be excited about the multiple growth opportunities for the interventional business.  In the fourth quarter and for the fiscal year, all interventional product categories showed significant increases . . . . [Three customers each accounted for more than 10 percent of fiscal 2003 interventional business revenue, and] all significantly increased their business with us. [Further] finished goods inventory of $2.1 million at October 31, 2003, reflected our customers' firm purchase orders."

Outlook For Fiscal 2004
The company anticipates consolidated revenue of $75 million to $79 million, a 29 to 36 percent increase over fiscal 2003 consolidated revenue.

December 3, 2003 Press Release; see Compl. ¶ 50.

> "The bottom line is: Despite the slow start in the interventional business Synovis is expecting a good year." [Larson] added "At this point in time, we have no basis to believe that we will not reach our annual guidance."

January 14, 2004 Star-Tribune article quoting January 13, 2004 Press Release; see Compl. ¶¶ 52-53.

Defendants argue the Complaint fails to specify which statements are false and fails to state with particularity why they misleading, as required by the PSLRA.  See 15 U.S.C. § 78u-4(b)(i); see also In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002).  The Court is satisfied the Complaint sufficiently identifies the allegedly false and misleading statements and the reasons why they are misleading.  The statements quoted above are included in a section entitled "False and Misleading Statements."  See Compl. at 22, ¶¶ 40-54.  Although the paragraphs quote the press releases in their entirety, they bold and italicize the allegedly false or misleading statements.

Paragraphs 39 and 66 of the Complaint further specify how the alleged statements were false or misleading.  In paragraph 66, Plaintiffs assert Defendants failed to disclose five "true" facts that make the above quoted statements false or misleading.  Those five "facts" are:

> (1) Synovis' 2003 growth rates were driven by channel stuffing, thereby creating excess inventory which must be used or sold before customers would return to purchasing at the levels necessary to meet the 2004 projected growth rates;
>
> (2) Synovis' surgical business could not sustain year-to-year growth and the company's explanation for Peri-Strips underperformance, that the number of surgeons qualified to perform procedures had declined, was false and misleading;
>
> (3) Synovis' interventional business could not meet 2004 growth projections in part because the Company had channel stuffed its largest customer.  As a result, the customer refused to take further delivery until it could work through its excess inventory;
>
> (4) Synovis' projections of fiscal 2004 EPS of $0.56 to $0.60 and revenues of $75 million to $79 million were without basis; and

11

(5) Synovis "was not generating sufficient capital through organic growth to provide the Company with the operating and investment capital necessary to fund a high growth rate and, therefore, an inflated stock price was necessary to raise the $39 million raised from the [stock sale]."

See Compl. ¶ 66.  Plaintiffs also support these assertions by citing to statements made by Larson in the May 19, 2004 teleconference indicating Synovis did not know how much its customers have in inventory and that there are never any expected orders.  Id. ¶ 39.  Assuming, for the moment, all of these five statements are factually true, they provide particularized facts detailing why the Defendants' statements are false and misleading.

Whether the Complaint appropriately identifies which statements are allegedly false or misleading, however, is distinct from whether Plaintiffs have pled with particularity the falsity of those statements themselves.  The allegedly false or misleading statements fall into four general categories: (1) statements concerning revenue and EPS projections for fiscal year 2003; (2) statements concerning the health and future prospects of Synovis and its surgical and interventional lines made in fiscal year 2003; (3) statements concerning revenue and EPS projections for fiscal year 2004; and (4) statements concerning the health and future prospects of Synovis and its interventional lines made in fiscal year 2004.  To satisfy the heightened pleading requirements of the PSLRA and Rule 9(b), Plaintiffs must plead with particularity why each of these statements is false.

### 1.      Revenue and EPS Projections for fiscal year 2003

The first group of challenged statements contest the veracity of Synovis' 2003 fiscal year revenue and EPS guidance, including the increased guidance issued in July 2003.  See Compl. ¶¶ 40, 42, 44-46, 48, 50.  It is undisputed that Synovis reported revenue and EPS met or exceeded all of its financial guidance for fiscal year 2003.  There has been no subsequent restatement of

Synovis' revenue or EPS.  Plaintiff alleges these statements are false and misleading because

Synovis achieved these revenue and EPS projections by inflating its revenue and growth rates

through channel stuffing .  Plaintiffs claim the majority of Synovis' sales were driven by a few

main customers and Synovis was selling product to inflate its 2003 fiscal results to customers at

a rate it knew was unsustainable.

Although Plaintiffs generally allege channel stuffing occurred, they do not provide the

"who, what, where, when and how" required under Rule 9(b) and the PSLRA.  Paragraph 66(b)

of the Complaint merely asserts:

> the growth rates by Synovis during 2003 were the result of selling unusually high levels
> of product to companies beyond what they could sell through during equivalent periods,
> thereby loading them up with inventory which would have to be sold off before they
> could resume purchasing at the same level or higher levels to meet defendants' 2004
> projected growth rates.

This statement does not articulate the customers, products or the timing when the purported

channel stuffing occurred.  Therefore, there is no basis for assessing whether the guidance was

misleading at the time it was issued or the time revenues were reported.  Paragraph 66(c) does

specify that

> . . . prior to and during the Class Period, the Company had shipped several quarters'
> worth of inventory of implantable cardio-defibrillators to the Company's largest
> [interventional] customer.  This customer was refusing to take delivery of anymore of the
> Company's products until and unless it could actually sell the already shipped product
> that was stuffed in the customers' warehouses and had been idle for months.

Although this statement is more specific as to the customer and product, it does not state with

particularity when the alleged practiced occurred or what amount of product was "stuffed."

Significantly, there are no facts alleging Synovis, rather than the customer, was responsible for

the increased shipments.[7]  Although Plaintiffs assert actual reported revenues for fiscal year 2003

were false and misleading, they fail to identify which reported revenues were false and why.

Courts have recognized "there is nothing inherently improper in pressing for sales to be

made earlier than in the normal course."  Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st

Cir. 1999) (finding the probative value of channel stuffing allegations weak and insufficient to

give rise to a strong inference of scienter); see also Johnson v. Tellabs, Inc., 262 F. Supp. 2d 937,

950 (N.D. Ill. 2003) (stating, in dismissing allegations of channel stuffing, "there certainly is

nothing inherently wrong with offering incentives to customers to purchase products" and

increase revenues, particularly when plaintiffs do not allege the incentives themselves were

improper).  Plaintiffs present no legal precedent for allegations of channel stuffing supporting a

PSLRA claim.  Although Plaintiffs cite two SEC Orders, they are administrative orders entered

into in contemplation of settlement and are not legal precedent.  See In the Matter of Sunbeam

Corp.; In the Matter of Coca-Cola Co., Exchange Act, Release No. 51565 (Apr. 18, 2005).

Finally, Synovis' track record of 24 consecutive quarters of revenue growth with an

average increase of 36 percent undermines Plaintiffs argument.  This record extends far beyond

the class period.  Although Synovis enjoyed record revenues in 2003, those revenues were not

anomalous with the company's past history of growth.  For these reasons, Plaintiffs have not

pled with particularity the falsity of Synovis' fiscal year 2003 revenue and EPS projections.

### 2.    Health and Future Prospects of Synovis and its Business Lines

---

[7] One analyst noted this customer "warned Synovis . . . that [the customer] overestimated demand for [implantable cardio-defibrillators] and, as a resut, had built up excess inventory." *Synovis Shares Fall as Firm Reduced Yearly Outlook,* Dow Jones Newswire, May 19, 2004; see Compl. ¶ 57.

The next group of challenged statements concern characterizations of the current health of the company and the future prospects of the company and its business lines.  See Compl. ¶¶ 40, 42, 44-46, 48, 50.  Representative comments include:

> "We continue to drive a very high growth rate across an expanding business," [said Larson].  "The surgical and interventional businesses are both strong contributors to the company's vitality, each successfully capitalizing on their full pipelines of opportunities. Our solid balance sheet and increasing profitability continue to provide us with the operating and investment capital necessary to internally fund a high growth rate."

Compl. ¶ 40.

> "Strong gains in both our surgical and interventional businesses over fiscal 2002 provide a solid basis for raising fiscal year 2003 guidance," said [Larson].  "The same factors that drove our growth in the first half of the year, increasing Peri-Strip sales and broad-based interventional business growth, are continuing into the third quarter."

Compl. ¶ 42

> The strength of [the surgical and interventional] businesses and the strategies each has in place underlie out enthusiasm as we look ahead. . . .  Individually, both businesses are performing well and are positioned for continuing success.

Compl. ¶ 46

Plaintiffs contend these statements are false and misleading because the interventional and surgical businesses were not on track for year-to-year growth.  To support this position, they assert as facts that: (1) Synovis was engaged in channel stuffing; (2) Synovis' explanation for the eventual poor sales on the surgical side did not make sense or match analysts' explanations; and (3) Synovis had channel stuffed its largest interventional customer with implantable cardioverter-defibrillators, forcing the customer to refuse further product until it had worked through its existing inventory.

Synovis correctly contends the challenged statements are forward-looking statements under Section 10(b) and Rule 10b-5.  15 U.S.C. § 78u-5(c).  Forward-looking statements apply

15

to projections regarding revenue, income, earnings, statements about management's plans or objectives, and statements involving future economic performance.  15 U.S.C. § 78u-5(i)(1)(A-C).  Consequently, a challenged forward-looking statement must be coupled with an allegation that the statement was made with actual knowledge that it was false and misleading to survive a motion to dismiss.  In re Navarre Corp. Sec. Lit., 295 F.3d 791, 799 (8th Cir. 2002).

Here, the statements in the press releases are clearly forward-looking.  The language itself references future performance, and is accompanied by cautionary language.  Specifically, each press release states:

> Forward-looking statements contained in this press release are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.  The statements can be identified by such words as "should", "may", "will", "expect", "believe", "anticipate", "estimate", "continue" or other similar expressions.  Certain important factors that could cause results to differ materially from those anticipated by the forward-looking statements made herein include the timing of product introductions, the number of certain surgical procedures performed and the level of orders from contract manufacturing customers.  A full discussion of factors can be found in the company's Annual Report on Form 10-K for the year ended October 31, 2002.

See, e.g., Aug. 20, 2003 Press Release at 5-6.  The company's Annual Report on Form 10-K lists additional important factors that could materially affect anticipated results.  2002 10-K (Carter Decl. Ex. 1) at 11-12.

The cautionary language relates to the future performance of Synovis; as a result, it addresses the allegedly misleading statement.  This language is sufficient to render the alleged misrepresentations forward-looking.  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 548 (8th Cir. 1997).  Furthermore, challenged statements that are not expressly forward-looking are generalized optimistic characterizations of Synovis' current or past performance and are inactionable as to be expected puffery.  See id. at 546 ("soft, puffing statements generally lack

16

materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements and they are certainly not specific enough to perpetrate a fraud on the market") (quoting <u>Hillson Partners Ltd. P'ship v. Adage, Inc.</u>, 42 F.3d 204, 213 (4th Cir. 1994)).

Plaintiffs argue the "safe harbor" for forward-looking statements does not apply here because Synovis either failed to accompany its forward-looking statements with appropriate cautionary language or made the statements at issue with actual knowledge of their falsity.

Plaintiffs argue the cautionary language is too general to provide "safe harbor" protection. They assert warnings such as "the number of certain surgical procedures performed and the level of orders from contract manufacturing customers" may affect projected revenues amount to nothing more than "revenues are dependent upon sales." However, the cautionary language in the press releases directs investors to the full discussion of factors in the company's Annual Report on Form 10-K for the year ended October 31, 2002. That discussion includes the following paragraph:

> DEPENDENCE ON SIGNIFICANT CUSTOMER: The risks associated with the Company's significant dependence on one interventional business customer, and the effects of the Company's operations and financial results with changes in the customer's ordering patterns or loss of the customer.

2002 10-K at 12 (emphasis in original). Furthermore, the December 3, 2003 Press Release discloses "Three customers each accounted for more than 10 percent of fiscal 2003 interventional business revenue, and all significantly increased their business with us." These statements are more specific than "revenue depends on sales" and are suitably tailored to provide protection under the PSLRA's safe harbor provision.

Finally, Plaintiffs have not alleged facts necessary to show the challenged statements are

17

false.  Plaintiffs' generalized channel stuffing allegations, as well as the allegations that Defendants sold a surplus of product to one interventional customer fail for lack of particularized facts.  The cautionary language in the press release provides further support for this conclusion.  The 2002 10-K was filed long before the commencement of the Class Period, further undermining Plaintiffs' argument that the language was crafted to protect Synovis against channel stuffing that was already occurring.

Plaintiffs also assert Synovis knew the surgical business was not on track for year-to-year growth because Defendants' 2004 explanation for the eventual decline in Peri-Strips sales did not match analysts' explanations.  Plaintiffs cast aside Defendants' explanation that sales fell due to capacity constraints based on analysts' conclusions that: (1) Peri-Strips are only used in 25% of gastric by-pass procedures and therefore growth would track with market acceptance of by-passes; (2) "even if the number of gastic by-pass procedures did decline, the medical communities conversion to the 'laproscopic' method . . . from the 'open' method . . . would have stemmed" the decline in sales; and (3) the actual reason for the underperformance is that Synovis' Peri-Strips are losing market share to competing companies.  Compl. ¶¶ 62, 66(b).

Plaintiffs' attempt to establish the falsity of the challenged statements based on Defendants' and analysts' divergent explanations is rejected.  First, the conclusions of analysts are not facts and do not alone establish Defendants' explanations to be false.  Second, Plaintiffs' attempt to show that the surgical business was not on track for year-to-year growth in 2003 by challenging Defendants' explanation for the eventual downturn in Peri-Strip sales in 2004.  Plaintiffs fail to plead the particularized who, what, where, when and how necessary to show Peri-Strips were not on track for year-to-year growth in 2003.

18

For the aforementioned reasons, Plaintiffs have failed to allege particularized facts showing statements made in 2003 concerning the health and prospects of Synovis were false or misleading.

### 3.     Revenue and EPS Projections for fiscal year 2004 and the Health and Future Prospects of Synovis and its Business Lines

Only two sets of statements concerning fiscal year 2004 are both bolded and italicized in the Complaint and identified as false and misleading in Plaintiffs' Opposition Brief:

Synovis will, as always, adjust its guidance when and if it seems appropriate to do so.

Outlook For Fiscal 2004
The company anticipates consolidated revenue of $75 million to $79 million, a 29 to 36 percent increase over fiscal 2003 consolidated revenue.

Dec. 3, 2003 Press Release; see Compl. ¶ 50.

"The bottom line is: Despite the slow start in the interventional business Synovis is expecting a good year," [Larson] added "At this point in time, we have no basis to believe that we will not reach our annual guidance."

Jan. 14, 2004 Star-Tribune article quoting Jan. 13, 2004 Press Release; see Compl. ¶¶ 52-53.

The Court will analyze in conjunction whether statements for fiscal year 2004 concerning the revenue and EPS projections as well as statements regarding the health and future prospects of Synovis were false and misleading.

Again, both statements appeared in press releases containing the following cautionary language:

Forward-looking statements contained in this press release are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. The statements can be identified by such words as "should", "may", "will", "expect", believe", "anticipate", "estimate", "continue" or other similar expressions. Certain important factors that could cause results to differ materially from those anticipated by the forward-looking statements made herein include the timing of product orders and shipments, the product development cycle of new customer opportunities, the timing of

19

new product introductions and related regulatory approval, the number of certain surgical procedures performed and the level of orders from contract manufacturing customers.  A full discussion of factors can be found in the company's Annual Report on Form 10-K for the year ended October 31, 2002.

See, e.g., Jan. 13, 2004 Press Release at 3.[8]

The identified statements concern revenue and EPS projections, the health of the interventional business and the future prospects of the company.  These are forward-looking statements protected under the PSLRA's safe harbor provisions unless Plaintiffs can allege facts indicating the statements were made with actual knowledge that they were false and misleading. Parnes, 122 F.3d at 548; In re Navarre, 295 F.3d at 799.

Plaintiffs allege the statements were false and misleading when made because: (1) Larson admitted during the May 19, 2004 earnings call that Synovis "did not have any basis for giving guidance or providing forecasts," and (2) Defendants knew, because they had engaged in channel stuffing, that the company as a whole, as well as the surgical and interventional businesses, were not capable of reaching the fiscal year 2004 guidance.  Pls.' Opp'n Brief at 17. In addition, based on this information, Defendants' statements that Synovis would "adjust its guidance when and if it seems appropriate to do so" and "[a]t this point in time, we have no basis to believe that we will not reach our annual guidance" are alleged to be false and misleading. Dec. 3, 2003 Press Release; January 14, 2004 Star-Tribune article quoting January 13, 2004

---

[8]  The 2003 10-K contains an extensive discussion of factors that might affect the company's anticipated performance, including a paragraph with the heading, "WE ARE DEPENDENT ON A SINGLE CUSTOMER FOR A LARGE PERCENTAGE OF THE SALES OF OUR INTERVENTIONAL BUSINESS."  2003 10-K (Carter Decl. Ex. 2) at 11.  The paragraph describes how the customer accounted for over 50 percent of Synovis' interventional revenue for the years ending October 31, 2002 and 2003.  Id.  However, the 2003 Form 10-K was not filed with the SEC until January 29, 2003 so the cautionary language in the press release incorporates the factors listed in the company's 2002 Form 10-K.

Press Release.

In support of their position that Defendants lacked a basis for Synovis' revenue and earnings projections, Plaintiffs rely on statements made by Larson during the May 19, 2004 earnings call.[9]  In particular, Larson stated "[w]e don't know how much our customers have in inventory, we don't know how much [Synovis' customers are] going to sell in the future."  May 19, 2004 Earnings Call at 20.  When asked "[s]o you really don't have an indication clearly as to any approximate level of inventories . . . that [customers] have in the interventional business?," Larson replied "[w]e do not and we don't know how their sales and marketing group is performing . . . ."  Id.  Furthermore, Larson admitted "there are never any expected orders" for products on the surgical side of the business.  Id. at 21.  When Larson was subsequently asked "[w]ouldn't it pay to stay in close contact with Synovis' customers and kind of find out what they're doing?," she responded, "[w]e talk to them everyday.  They don't share this kind of information."  Id. at 25.

Plaintiffs chose to ignore Larson's comments, made in the same earnings call, detailing Synvovis' basis for making revenue and EPS projections.  Larson explains Synovis' customers are reluctant to share information on their inventory because it would provide visibility into their sales.  Id. at 25.  Larson also noted that the speed in which a customer exhausts its inventory is based on the success of their sales and marketing groups.  Id. at 20.  In lieu of inventory information, Larson acknowledged that Synovis based its projections on past sales and educated guesses on how much product the customer had used recently.  Id. at 25-26.  Larson also stated

---

[9]  The May 19, 2004 Earnings Call again included cautionary language pursuant to the PSLRA's safe harbor for forward-looking statements.  See May 19, 2004 Earnings Call at 1.  The cautionary language referenced the factors contained in the 2003 Form 10-K.  Id.

Synovis representatives talked with their customers "everyday" to gauge the need for additional product.  Id.  Although Larson admitted Synovis lacked knowledge of its customers' inventory, contrary to Plaintiffs' assertions, she never admitted the revenue and earnings projections were without basis.

Furthermore, in a January 13, 2004 Earnings Call, Fariborz Boor Boor, Executive Vice President, discussed the methodology used to determine Synovis' revenue and earnings projections:

> We plan our fiscal year revenue and operating budgets based on product component demand forecasts provided to us by our customers.  These are based on anticipated sales for different product categories forecasted through customers' marketing organizations.  At our request, the forecast data is provided to us in August and September of every year, based on the marketing information that's available to them at that time.

Jan. 13, 2004 Earnings Call (Carter Decl. Ex. 11) at 3.

Plaintiffs do not allege Defendants' stated revenue and EPS projections were based on knowledge of their customers' inventories or that industry standards require such knowledge.  See also Jan. 13, 2004 Earnings Call.  Although Larson acknowledged Synovis does not know the inventories of its customers, such an admission does not equate with a conclusion that Synovis "did not have any basis for giving guidance or providing forecasts."  Pls.' Opp'n Brief at 17.  Plaintiffs do not allege the methodology set forth by Defendants in the January 13, 2004 and May 19, 2004 Earnings Calls is false or misleading.  Therefore, Plaintiffs have not pled with particularity the falsity of Defendants' revenue and earnings projections.

Plaintiffs also claim Defendants' statements that Synovis would "adjust its guidance when and if it seems appropriate to do so" and that, as of January 13, 2004, Synovis had "no basis to believe that we will not reach our annual guidance" were false at the time they were

made.  See Dec. 3, 2003 Press Release; Jan. 13, 2004 Press Release.  At oral argument,

Plaintiffs' counsel asserted that Larson admitted during the May 19, 2004 Earnings Call that

Synovis should have revised its guidance downward earlier.  However, in Plaintiffs' June 9,

2005 letter to the Court, counsel admitted this conclusion was based on the assertion of one CNN

analyst.  See Compl. ¶¶ 60-61.  In fact, in the May 19, 2004 Earnings Call, Larson was

specifically asked, with the benefit of 20/20 hindsight, whether Synovis had reason to anticipate

the surplus in customer inventory and the company's resulting underperformance sooner.  Larson

responded, "The answer is no.  We would have reduced our guidance at the end of the first

quarter if we had information that would have led us to that path."  May 19, 2004 Earnings Call

at 14.

In both the January 13, 2004 and May 19, 2004 Earnings Calls, Defendants acknowledge

that sales for the first quarter of fiscal year 2004 were slow while Synovis' main customers

worked through a stockpile of inventory.  Jan. 13, 2004 Earnings Call at 1-3; May 19, 2004

Earnings Call at 6.  However, Defendants also state, as the year continues, they expected sales to

increase to levels that would permit them to reach revenue and EPS projections.  Jan. 13, 2004

Earnings Call at 5; May 19, 2004 Earnings Call at 14, 24.  Plaintiffs do not plead with

particularity facts sufficient to show Defendants had information available to them that would

have required them to revise its guidance earlier.  The bald assertion of one broadcasting analyst

is insufficient to plead with particularity that Defendants failed to adjust Synovis' guidance when

it possessed information indicating it was appropriate to do so.[10]

---

[10]  Plaintiffs' allegations that Synovis engaged in channel stuffing have been previously
rejected, supra, and the rationale will not be repeated here.

D.      **Scienter**

Assuming they had pled with sufficient particularity the falsity of the challenged

statements, Plaintiffs must also clear the threshold of the PSLRA's scienter requirement.

Although "scienter is not explicitly required by the statutory text of the Exchange Act . . . it is an

acknowledged essential element of a section 10(b) and Rule 10b-5 claim." Id. at 893.  The

PSLRA, therefore, requires that a pleading must "state with particularity facts which give rise to

a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2).  The required state of mind is "the intent to deceive, manipulate, or defraud." Kushner

v. Beverly Enterprises, 317 F.3d 820, 827 (8th Cir. 2003).  To plead scienter with particularity,

Plaintiffs must allege "such matters as the time, place and contents of false representations, as

well as, the identity of the person . . . ." In re K-Tel Int'l, 300 F.3d at 890 (citation omitted).

"Inferences of scienter survive a motion to dismiss only if they are both reasonable and strong."

Id.

Plaintiffs can satisfy the scienter requirement in one of three ways: (1) by pleading

specific facts demonstrating "the intent to deceive, manipulate, or defraud;" (2) by pleading

specific facts giving rise to the level of "severe recklessness;" or (3) by pleading allegations of

"unusual or heightened" motive or opportunity.  See id., 300 F.3d at 893-94.  To establish

scienter through recklessness, Plaintiffs must demonstrate "highly unreasonable omissions or

misrepresentations involving an extreme departure from the standards of ordinary care, and . . .

present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is

so obvious that the defendant must have been aware of it." Id. at 893 (citations omitted).

Motive and opportunity are both relevant to the scienter inquiry, "but particularly important to

establishing scienter is a showing of unusual or heightened motive to meet the Reform Act

standard." Id. at 894 (citation omitted).  Without a showing of motive and opportunity, the

remaining allegations against the defendants must be particularly strong to constitute an

inference of recklessness.  Id.  Specifically, unsupported allegations that defendants had motives

common to all officers and directors – such as keeping the stock price high for the general

purpose of increasing compensation or the desire to make the corporation appear profitable – are

insufficient to establish scienter.  Id.  However, if the stock price was artificially inflated for the

purpose of selling stock, scienter may be established.  Id.

### 1.      Intent and Recklessness

Plaintiffs allege Larson's comments during the May 19, 2004 Earnings Call raise a strong

inference that Defendants either knew or were reckless in not knowing their statements were

materially false and misleading when made.  On the basis of these statements, Plaintiffs conclude

Defendants knew, or should have known, Synovis "did not have any basis for giving guidance or

providing forecasts."  Pls.' Opp'n Brief at 17.

The Eighth Circuit has stated that "[o]ne of the classic fact patterns giving rise to a strong

inference of scienter is that defendants published statements when they knew facts or had access

to information suggesting that their public statements were materially inaccurate."  Fla. St. Bd.

of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001).  Furthermore, officers

are responsible for facts reasonably available to them, particularly when the facts are critical to a

business' core operation or an important transaction.  See In re K-tel Int'l, 300 F.3d at 891; In re

Ancor Communications, Inc. Sec. Litig., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998).

For the reasons previously discussed, Plaintiffs' allegations that Defendants had "no

basis" for providing revenue and earnings projections, and thereby issued intentionally or recklessly false or misleading statements, are unpersuasive.  In the May 19, 2004 and January 13, 2004 earnings call, Defendants set forth the methodology used to determine Synovis' revenue and earnings projections.  Plaintiffs have not alleged the proffered methodology was false or misleading.  Consequently, Plaintiffs' allegation that Defendants knew or should have known they had no basis for making revenue and earnings projections fails.

### 2.     Motive and Opportunity

Plaintiffs invoke motive and opportunity to assist their argument in support of a strong inference of scienter.  Plaintiffs argue Defendants inflated Synovis' stock price to: (1) implement its growth by acquisition strategy; (2) address the company's cash flow problems; (3) increase individual executives' compensation, promotion and job security prospects; and (4) sell stock and exercise options at a substantial profit.

### a.     Growth By Acquisition

Plaintiffs argue Synovis' expressed intent to grow through acquisition provided motive sufficient to establish scienter.  Defendants have repeatedly stated that growth by acquisition was an important component of Synovis' corporate strategy.  See Compl. ¶¶ 21, 27.  Indeed, Synovis acquired three companies in the four years prior to the class period and Larson admitted in an August 18, 2004 Earnings Call that it had unsuccessfully attempted to acquire a fourth during the class period.  Compl. ¶¶ 22, 23, 24, 25, 27, 29.  Plaintiffs assert Synovis attempted to finance this growth by acquisition strategy through stock sales and the sales of equity.  Consequently, Plaintiffs contend, Synovis had motive to inflate the stock price prior to the September 2003 stock sale.

There is nothing inherently fraudulent about a company pursuing a growth by acquisition strategy or in offering stock to fund acquisitions.  Courts have repeatedly held that "a desire to further a corporate acquisition strategy is too general" to raise a strong inference of scienter. Tricontinental Indust. Ltd. v. Anixter, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2003); see, e.g., Darby v. Century Business Services, Inc., 96 Fed. Appx. 277, 282-83 (6th Cir. 2004); Merxin v. Provident Fin. Group, Inc., 311 F. Supp. 2d 674, 681-83 (S.D. Oh. 2004); In re First Union Corp., 128 F. Supp. 2d 871, 896 (W.D.N.C. 2001).  In the last several years, Synovis has consistently engaged in a growth by acquisition strategy.  This history makes the attempted acquisition, or the stock sale that allegedly would have funded the acquisition, less suspicious. Further undermining Plaintiffs' argument is the admission that no acquisition ever occurred, despite the successful completion of the stock sale.  For these reasons, the Court finds Synovis' expressed intent to grow through acquisition does not raise a strong inference of scienter.

### b.    Cash Flow Problems

Plaintiffs also claim Synovis relied on the September 19, 2003 stock sale to acquire cash for acquisitions and business operations.  Compl. ¶¶ 27-29.  The private placement sale yielded gross proceeds of $39 million.  Consequently, Plaintiffs argue Defendants were motivated to inflate the stock price to ensure a successful stock sale.

At the time of the stock sale, Synovis planned "to use the net proceeds of $36.5 million for working capital, general corporate purposes and potential acquisitions."  Compl. ¶ 28 (quoting Sept. 19. 2003 Star-Tribune article).  Defendants do not challenge this statement. However, beyond their own assertions, Plaintiffs have offered no indication that Synovis was experiencing cash flow problems.   Moreover, business problems alone are not sufficient to

establish scienter.  See Ronconi v. Larkin, 253 F.3d 423, 430 (9th Cir. 2001).  Although the

timing of the stock sale falls squarely within the class period, in the absence of other

corroborating motives and circumstances, it is insufficient to raise a strong inference of scienter.

See Kushner, 317 F.3d at 827.

**c.    Compensation, Performance and Promotions**

Plaintiffs next allege Defendants were motivated to inflate their stock price to increase

their compensation, obtain promotions and retain their positions in the company.  In support of

this theory, Plaintiffs assert Larson's total compensation increased during the class period and

that three individuals, Boor Boor, Mary Frick and B. Nicholas Oray were promoted due to the

success of their respective divisions.  Compl. ¶¶ 34-36.  They also note that Boor Boor, who had

led the interventional side of the business, resigned as Executive Vice President when Synovis'

stock price fell.  Compl. ¶ 35.

The Eighth Circuit has stated that "unsupported allegations with regard to motives

generally possessed by all corporate directors and officers are insufficient as a matter of law."  In

re K-Tel Int'l, 300 F.3d at 894.  Such motives include the desire to maintain a high corporate

credit rating or the appearance of corporate profitability, and the desire to maintain a high stock

price in order to increase executive compensation.  Id. quoting Kalnit v. Eichler, 264 F.3d 131,

139 (2d. Cir. 2001).  The Eighth Circuit has found that the magnitude of an executive's

compensation and performance based earnings, together with the coincidental timing of the

company overstating earnings in the last year of the executive's contract, provide a strong

inference of scienter.  Green Tree, 270 F.3d at 661; see also Kushner, 317 F.3d at 830.  In Green

Tree, however, the executive received $102 million in compensation.  Id.  A salary of that

28

magnitude is not at issue in this case, where Larson received a 20 percent increase in base salary, a performance bonus and "stock gains" totaling $1,636,000.

Furthermore, Boor Boor, Frick, Oray and other individuals claimed to be motivated by self interest are not named Defendants.  Their desire to obtain a promotion is the type of motive ascribed to all executives.  Nor is the resignation of a senior executive following the fall in a company's stock price sufficient to raise a strong inference of scientor.  Indeed, senior corporate officers often resign or are terminated if their division of the corporation performs poorly.

### d.      Stock Sales and Options Exercised

Finally, Plaintiffs argue the individual Defendants and other top executives were motivated to inflate their stock price to sell shares at inflated prices and to exercise their options using inflated stock as currency.  Plaintiffs contend the total amount of these stock sales during the class period, which they claim total $3.6 million, itself demonstrates these sales were unusual and raises an inference of wrongdoing.[11]

As the Eighth Circuit has noted, "[i]nsider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  In re Navarre, 299 F.3d at 746 (quoting In re Vantive Corp. Sec. Litig., 283 F.3d at 1079, 1092 (9th Cir. 2002)).  "Unusual insider trading activity during the class period may permit an inference of bad faith and scienter."  In re K-Tel Int'l, 300 F.3d at 895 (citation omitted).

Plaintiffs' Complaint alleges only the number of shares each executive sold and the gross

---

[11]  This figure includes an apparent mathematical error regarding the proceeds realized from Oray's July 7, 2003 stock sale.  Oray sold 500 shares at a price of $22.01, which amounts to $11,005, rather than the $821,171 reported by Plaintiffs.  See Compl. Ex. A at 3, Ex. B at 3.

profit realized for each stock sale during the class period.  As a result, it is impossible to determine whether the sales were "unusual in timing and amount."  Id. (finding no showing of unusual trade activity where "[t]he Class failed to allege the prior history of sales for the defendants or even the number of shares held by each").

Confined to evaluating the stock sales based on the information provided in the Complaint, nothing indicates the sales were "unusual in timing and amount."  Plaintiffs identify the stock sales of eleven different executives, totaling 127,624 shares, as suspect.  Compl. Ex. B.  Only one of these eleven executives, Larson, is a named Defendant.  Furthermore, all but 22,324 of the shares were sold on or before June 17, 2003, over eleven months before the May 19, 2004 downward revision of guidance.  Id.  None of the sales occurred after March 17, 2004.

Larson sold 24,800 shares of stock, all prior to June 10, 2003 and used the proceeds to exercise her option to purchase 41,700 shares.  As a result, Larson actually increased her total amount of Synovis stock during the class period.  Magnuson, the other named Defendant, did not sell any stock during the class period but did exercise options to buy shares.  Nonetheless, Plaintiffs argue the inflated stock price allowed Larson to sell her existing shares and purchase others at a fraction of the cost.  Likewise, Plaintiffs contends Magnuson obtained her options at a price far higher than the value required to exercise them.  However, Larson, Magnuson and the other executives were significant shareholders in Synovis who stood to lose as much, or more, as any investor.  Under Plaintiffs' theory, Defendants engaged in a fraud they knew would ultimately decrease the price of stock they had just purchased.  Yet, neither Larson nor Magnuson decreased their total shares during the class period to realize a profit while the stock price was high.  Such a scheme is insufficient to raise a strong inference of scienter.

The Complaint also questions the stock sales of several other executives.  Two of these executives, Boor Boor and Perkins, also exercised options to purchase stock during the class period and thereby increased their overall holdings in Synovis.  Plaintiffs provide no information to suggest stock sales by any of these executives were "unusual in timing and amount."  Rather than sell significant amounts of stock in the period when Plaintiffs' allege Synovis executives were aware that they would not make the 2004 fiscal guidance, they reaffirmed their confidence in the company:

> Many of us at the company, along with our directors, are significant shareholders.  We believe this slow start to the year in the interventional business is a short-term situation, and while certainly not desirable in its perception, we are not discouraged by it. . . .  We are advancing these opportunities daily in both business segments.  At this point in time, we have no basis to believe we will not reach our annual guidance.

Jan. 13, 2004 Form 9-K.

For the aforementioned reasons, Plaintiffs have not alleged sufficient evidence to show the sale of stock and the purchase of options gives rise to a strong inference of scienter.

### 3.        Scienter Collectively

Green Tree suggests that allegations of scienter may also be considered collectively.  270 F.3d at 660.  After reviewing all of Plaintiffs' allegations, the Court is unconvinced that they collectively amount to a strong inference of scienter.  Plaintiffs offer a weak array of allegations cobbled together in an effort to prove fraud-by-hindsight.  Such allegations, even when considered collectively, are insufficient to give rise to a strong inference of scienter.

### E.        Alleged Exchange Act Section 20(a) Violations

In addition to the 10(b) and 10b-5 claims, Plaintiffs allege violation of Section 20(a) of the Exchange Act against the individual Defendants.  "Section 20 of the Exchange Act extends

liability for fraudulent conduct under Section 10(b) to individual controlling persons found to have committed securities fraud." In re: Xcel Energy, Inc., 286 F. Supp. 2d 1047, 1059 (D. Minn. 2003) (citing 15 U.S.C. § 78t(a)).  Like a 10(b) or 10b-5 claim, the primary violation under Section 20 must be pled with particularity as required by the PSLRA.  Vohs v. Miller, 323 F. Supp. 2d 965, 973 (D. Minn. 2004).  Because Plaintiffs based their Section 20(a) claims on the same allegations as the 10(b) and 10b-5 claims, the Section 20(a) claims fail for the same reasons.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiffs' Motion to Amend the Complaint [see Docket No. 40] is **GRANTED**; and

2.  Defendants' Motion to Dismiss [Docket No. 29] is **GRANTED**; and

3.  Plaintiffs' Complaint [Docket No. 27] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 25, 2005.

32